IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD RAY RAGER, :  CIVIL NO. 3:10-CV-0594
   Plaintiff, :
       :  (Judge Munley)
   v.     :
       :
PRISON HEALTH SERVICES, INC., :
et al.,      :
   Defendants :

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Plaintiff Ronald Ray Rager ("plaintiff" or "Rager"), an inmate incarcerated at the State Correctional Institution at Retreat ("SCI-Retreat"), Hunlock Creek, Pennsylvania, filed this civil rights action on May 17, 2010. (Doc. 1.) The matter is currently proceeding *via* an amended complaint which was filed on November 3, 2010. (Doc. 27.) "The plaintiff brings this action under 42 U.S.C. § 1983 and alleges that the defendants violated his Eighth Amendment rights when they failed to adequately treat two epididymal cysts and failed to provide him with adult diapers." (Doc. 81, at 1.) Presently ripe for disposition is a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 filed on behalf of the remaining defendants Joseph Mataloni ("Mataloni"), Julia Kerker ("Kerker"), and Gerardette Kasprzyk ("Kasprzyk").[1] (Doc. 57.) For the reasons set forth below, the motion will be granted.

---

[1]On April 28, 2011, the complaint against defendants Prison Health Services, Inc, Jennifer Porta and Dr. Nebloni was dismissed. (Doc. 47).

## I.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, the movant is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  In pertinent part, parties moving for, or opposing, summary judgment must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Colwell v. Rite-Aid Corp., 602 F.3d 495, 501 (3d Cir. 2010) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

The pertinent portions of the Middle District of Pennsylvania Local Rules of Court, which are set forth in the Standing Practice Order served upon plaintiff on March 17, 2010 (Doc. 4), provide that in addition to filing a brief in response to the moving party's brief in support, "[t]he papers opposing a motion for summary judgment shall included a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] . . . , as to which it is contended that there exists a genuine issue to be tried." See M.D. Pa. LR 56. 1.  The rule further states that the statement of material facts required to be served by the moving party will be deemed

to be admitted unless controverted by the statement required to be served by the opposing party. See id. In addition to being notified of the rule *via* the Standing Practice Order, plaintiff was directed to this local rule requirement and ordered to file a statement of material facts responding to defendants' statement on two other occasions. (Docs. 75, 78.) Because plaintiff has failed to file a separate statement of material facts controverting the statement filed by defendants, all material facts set forth in defendants' statement (Doc. 62) will be deemed admitted.

## II.    **Statement of Material Facts**

Prior to his incarceration, Rager was treated by a urologist, Dr. Ganabathi, for complaints of nighttime urinary incontinence. (Doc. 62, ¶ 2.) After his incarceration, Dr. Ganabathi forwarded his medical records to Pennsylvania Department of Corrections ("DOC") medical staff. (Id. at ¶ 5.) Dr. Ganabathi determined that there were no physical abnormalities causing Rager's complaints of night-time incontinence and informed Rager that diapers were not the best treatment for the condition and prescribed Ditropan to treat the condition. (Id. at ¶¶ 3-4.) Dr. Ganabathi informed medical staff that he did not recommend use of the diapers but that diapers could be used. (Id. at ¶ 5.) He also noted that he prescribed Ditropan to Rager, but that he had not been compliant with that medication. (Id.)

Rager was transferred to SCI-Retreat on January 19, 2006. (Doc. 62, at ¶ 6.) At the time of his transfer he was examined and evaluated by a nurse, who reported that Rager indicated that he had a history of bladder control problems and had been using Depend (adult

diaper) undergarments to address the condition. (Id. at ¶ 7.)

From January 2006 through April 2010, SCI-Retreat medical staff examined Rager and treated, or attempted to treat Rager for his complaints of urinary incontinence and associated conditions on more than 65 occasions.  The following chronological outline of the pertinent treatment provided or offered to Rager, which is set forth in the statement of material facts, is primarily extracted from the declarations of defendant Mataloni and Dr. Chiavacci:

On January 20, 2006, Rager was evaluated by Dr. Renato Diaz for complaints regarding his overactive bladder.  Dr. Diaz noted that Rager had been evaluated for this condition at his prior institution, SCI-Graterford.

On April 11, 2006, Rager was seen in the infirmary by PA Yarczower regarding urinary incontinence, claiming that he had been seen by 3 different urologists on the outside but could not remember their names.  PA Yarczower examined Rager and issued an order for a urinalysis and a weekly supply of Depends.  The ordered urinalysis was performed on April 12, 2006 and was found to be within normal limits.

On April 17, 2006, Rager was examined by Dr. Diaz regarding urinary incontinence and was referred to a urologist for a consult.

On May 10, 2006, Rager was seen by Dr. Campenni, an outside urologist, for evaluation of his urinary bladder and complaints of incontinence.  Upon consultation, Dr. Campenni determined that Rager had an overactive bladder.  The urologist suggested Ditropan to address the condition and recommended an ultrasound.  Following the consult, Dr. Diaz prescribed Ditropan through August 17, 2006 and ordered an ultrasound of Rager's kidneys and bladder.

The ultrasound was performed on June 8, 2006 and the results were normal; however, there was evidence of urinary retention noted.

On June 23, 2006, Rager reported to sick call with a complaint of a rash which he attributed to wearing his adult diapers at night.  The treating PA noted that he

4

stated that his incontinence had improved with the use of the Ditropan and the adult diapers and prescribed clotrimasole 1% cream to address the rash.

On June 25, 2006, Rager was again seen in sick call for continued complaints of a rash. An order for adult diapers was issued, permitting Rager to receive diapers twice a day.

On July 5, 2006, Rager returned to sick call complaining that the rash persisted. Rager was issued additional clotrimasole cream was issued and was instructed on proper personal hygiene habits.

On August 17, 2006, the physician renewed Rager's Ditropan prescription.

On September 14, 2006, the treating PA reviewed Rager's medical chart and issued an order instructing him to pick up his adult diapers and urine guards in the morning treatment line.

On October 3, 2006, Rager reported to sick call and requested a Texas catheter to control his urinary incontinence. Rager was informed that his bladder and kidneys were functional and that a Texas catheter was not medically indicated.

On October 5, 2006, Rager was reported as hoarding diapers in his cell, which presented a security risk and fire hazard. Rager had been permitted to receive 14 adult diapers per week since sometime shortly after his arrival at SCI-Retreat. However, Rager had been requesting diapers from several different medical staff during the week, resulting in an excess of diapers being issued and held by Rager. An order was issued stating that Rager could have only 7 diapers in his cell at any given time.

The October 5 order was clarified the following day. The order was modified to provide for the issuance of 7 diapers every Tuesdays and Saturday for a six month period. As a result, Rager was still permitted to receive up to 14 diapers and urine guards per week.

On October 18, 2006, nursing staff noted that Rager was non-compliant with his Ditropan prescription. Rager was referred to a physician for an evaluation of whether his medication should be discontinued.

Dr. Chiavacci met with Rager on October 19, 2006 regarding his refusal to take the Ditropan. Rager stated that he did not believe that the medication was helping

and stated that he wanted to stop the medication. Dr. Chiavacci discontinued the Ditropan and initiated bladder training. "Bladder training" refers to measures taken to train the bladder muscles to increase bladder control. Patients are instructed to refrain from drinking large quantities of fluids, perform muscle training exercises, such as kegel exercises, and to visit the bathroom more frequently to avoid "accidents"

On October 30, 2006, Rager was seen in sick call for complaints of painful urination. The PA did a urine dipstick to check for infection and performed a genito-urinary exam and an ano-rectal exam. The results for all tests were within normal limits.

On November 2, 2006, Rager was examined by Dr. Diaz in the chronic care clinic. Following the exam, Dr. Diaz ordered a follow-up urinary bladder ultrasound and a follow-up evaluation with the urologist.

The urinalysis was performed on November 3, 2006 and indicated no abnormalities.

On December 3, 2006, Rager appeared in the treatment line and was offered diapers and urine guards. He refused, stating that he did not want the diapers and urine guards offered and would wait until different diapers arrived at the institution.

On December 7, 2006, Rager also refused to consent to the request ultrasound of his kidneys and bladder, stating: "I already had one and it was OK".

On February 22, 2007, Rager was seen in sick call complaining of a rash and a lump on his right testicle. Rager was issued a standing prescription for A&D ointment as needed through May 24, 2007 to address the rash, and he was directed to return to sick call if the symptoms increased.

Rager was again seen in sick call on April 10, 2007 for complaints of diaper rash. He was issued additional A&D ointment.

Rager again returned to sick call on April 17, 2007 for additional A&D ointment and the ointment was issued.

On May 10, 2007, Rager returned to sick call for additional diapers. It was noted that supplies had been ordered but had not yet arrived. As this was not a Tuesday

or Saturday, the days on which Rager was to be issued diapers, no diapers or other supplies were issued. The diapers still had not arrived by the May 12, 2007 and May 15, 2007 distribution days. Because the diapers had not yet arrived, Rager was issued 7 absorbent medical pads on each date and was instructed to return for additional pads as needed. The adult diapers had arrived by the next distribution date, May 19, 2007, and Rager was issued 7 adult diapers.

Rager was seen in sick call on June 1, 2007 for a follow-up examination regarding his incontinence. He was counseled on the use of a Texas catheter and was issued one catheter to evaluate its effectiveness addressing Rager's condition.

Rager was again seen in sick call on June 6, 2007 for a renewal of A&D ointment.

Rager was seen by the physician on June 8, 2007 to discuss the continued use of the catheter. He was instructed to continue to use diapers with the catheter as needed.

Rager was again seen in sick call on July 5, 2007 for A&D ointment and for incontinence supplies. He stated that the Texas catheter had broken. He was issued 3 new Texas catheters and a leg bag with tubing for collection.

Rager was again seen in sick call on July 7, 2007 requesting additional Texas catheters and diapers. He was issued 3 additional Texas catheters and 3 adult diapers. Texas catheters are generally expected to be used for one week. Rager offered no explanation for why he requested additional catheters only 2 days after 3 catheters had been issued to him.

Rager returned to sick call on July 9, 2007 with complaints of pain and skin irritation on his penis following use of the Texas catheter. The catheter was discontinued and Rager was issued antibiotic ointment for the skin irritation.

Rager was seen by Dr. Diaz in the chronic clinic on November 16, 2007 for a follow-up appointment regarding Rager's incontinence. Following the examination, Dr. Diaz renewed the order for diapers through May 11, 2008.

Rager returned to sick call on September 22, 2008 requesting pull up briefs or "shields", complaining that the adult diapers would rip when being pulled on or off.

Rager returned to sick call on November 7, 2008 for a renewal of the order for

adult diapers. The order for adult diapers was continued through May 2, 2009.

Rager returned to sick call on November 29, 2008 requesting medical absorbent pads, smaller briefs or other protective covering for bed sheets. He was advised to use extra brief under him when sleeping.

Rager returned to sick call again on December 2, 2008 requesting smaller briefs. He was informed that the infirmary only had the size that P has previously used.

Rager again returned to sick call on December 9, 2008 complaining that his diapers were leaking. The examining physician discussed Rager's medical history with him and instructed Rager to try adjusting the diapers to fit. The physician issued a prescription for Ditropan.

The adult diapers issued to P had adjustable tabs on the side, which could be tightened or loosened to adjust the fit.

On December 10, 2008 Rager was again seen in sick call for complaints of diaper leakage. A meeting was held between Rager, Dr. Diaz, Mr. Mataloni and UM Kerker. Rager was informed that the diapers are bought in bulk and that he was being issued the same diapers that had been issued to him for the past several months. He was informed that pull-up briefs would not be purchased for him because the diapers were adequate to address his needs and that any concerns regarding fit could be addressed using the adjustable tabs. He was also informed that the tabs could be opened and re-closed when needed and that tape would be provided by Ms. Kerker if he continued to rip the diapers. Rager was also reminded that his existing diagnosis did not indicate a regular need for diapers since he had no physical abnormalities of the kidneys or bladder. Rager was reminded that the diapers were to be used to address infrequent episodes of brief incontinence. He was also requested to comply with the medical staff's recommendations regarding medication.

Rager returned to sick call on December 12, 2008 complaining of diarrhea. He stated that he believed the condition was caused by the Ditropan and/or the cysts. Rager was informed that the epididymal cysts were small and were not the cause of the diarrhea or his incontinence. It was also explained that he had previously been placed on Ditropan for several months and that he had tolerated the medication when previously prescribed. Nevertheless, the Ditropan prescription was placed on hold for 3 days.

8

Rager again returned to sick call on December 23, 2008 complaining of dry mouth and nose, stating that his incontinence had continued on the Ditropan and that his briefs continued to be a problem because they would rip when he took them on or off. The Ditropan was discontinued.

Rager returned to sick call on January 12, 2009 and February 5, 2009 complaining about diaper rash. A&D ointment was issued on both dates to address the complaint.

On March 2, 2009, Mr. Mataloni requested that medical staff review Rager's chart to re-assess the discontinuance of Ditropan, the medication previously prescribed to treat Mr. Rager's medical condition. The reviewing physician issued Rager a prescription for bentyl, an antispasmodic, to address his incontinence.

Rager returned to sick call complaining of stomach upset on March 5, 2009 after taking 1 dose of the bentyl. He was instructed to take medication with food, to decrease naps and increase his bathroom breaks. The physician decreased the frequency of the doses from 4 times per day to three times per day.

Rager again returned to sick call on March 16, 2009 complaining that the bentyl made him overly tired and complaining of diaper rash. The medication was discontinued and A&D ointment was issued. Rager was also instructed to use more frequent bathroom breaks.

On March 31, 2009, Rager returned to sick call complaining about a numb finger and diaper rash. The physician noted that Rager was not wearing a diaper and that there were no urine stains on his underwear. A&D ointment was issued and Rager was reminded to use the toilet rather than soiling the diapers to avoid continued diaper rash.

On May 2, 2009, Rager returned to sick call with numerous complaints, including diaper rash. Rager was again reminded about the need for bladder training and was advised to use the toilet, rather than his diaper, more frequently. He was issued A&D ointment.

Rager was seen at sick call again on May 5, 2009 for continued complaints of diaper rash. The A&D ointment was discontinued and Rager was issued antifungal ointment through May 19, 2009.

Rager returned to sick call requesting a renewal of the order for diapers on May

9

25, 2009. The order was renewed for two diapers per day through July 31, 2009.

Rager was again seen in sick call on June 29, 2009 for continued complaints of incontinence. A urinalysis was ordered to rule out a urinary tract infection.

Rager refused the urinalysis.

At some point prior to July 2009, Nurse Supervisor Kasprzyk measured Rager and ordered diapers designed to fit Rager per the manufacturer's specifications. This was an attempt to accommodate Rager's prior complaints about diaper fit.

On July 27, 2007, Rager returned to sick call complaining that the diapers that had been ordered and issued to him were too tight. The examining PA noted that there was 1 finger's width between the edge of the diaper and the inside of the leg. The order for diapers was renewed through September 30, 2009.

On August 17, 2009, Rager was seen in the chronic clinic for asthma and overactive bladder. He was again prescribed Ditropan to address his incontinence.

On October 14, 2009, Rager was seen in sick call for several complaints, including a diaper rash and frequent urination. The order for diapers was renewed for an additional 6 months, a urinalysis was ordered and Rager was prescribed an antifungal cream to treat the diaper rash.

The ordered urinalysis was performed on October 20, 2009.

Rager returned to sick call on November 13, 2009 with complaints of diaper rash. He was issued an order for A&D ointment as needed through January 13, 2010.

Rager again returned to sick call on November 17, 2009 complaining about diaper rash and requesting an order for baby powder.

On November 25, 2009 a meeting was scheduled between Mr. Rager, administrative staff and medical staff regarding Rager's complaints of incontinence. It was noted that Rager had previously been examined 2-3 times by outside urologist and diagnosed with overactive bladder and had been prescribed Ditropan but that Rager had not been compliant with the prescribed medication. An extensive bladder training program was arranged. Ms. Kerker scheduled additional bathroom access for Rager to facilitate the bladder training program. The bladder training program was explained to Rager, including toilet times, the

10

need for limiting fluids, and kegel exercises. Rager was noted as being resistant to the program. He was instructed to follow up with the doctor in one month. An order was issued discontinuing the diapers as not medically necessary. Rager was instructed that he could use C-fold paper towels to address any "accidents" that occurred during bladder training. During the meeting, Ms. Kerker also expressed concerns about Mr. Rager's negative impact on the effective administration of the housing unit through his misuse of the diapers and his inappropriate methods for disposing of his soiled diapers.

At some point after this meeting, it was discovered that Rager had been improperly disposing of his diapers and that his cellmate had been keeping Mr. Rager's adult diapers and was sleeping with them under his bedding, resulting in unsanitary conditions.

Rager was seen in the chronic care clinic on February 9, 2010 to evaluate the status of his overactive bladder.

Rager again reported to sick call on February 19, 2010 requesting that he needed to have the diapers reordered. Rager was again informed that the diapers were not needed and was instructed to continue using the toilet.

On March 6, 2010, Rager reported to sick call complaining of a pain in his bladder when he urinated. He denied burning on urination and requested a renewal of his diapers. He was noted as walking without difficulty and as being in no acute distress with a normal temperature. He was scheduled to see the physician for further evaluation.

Rager again reported to sick call on March 8, 2010 and stated that he had pain after urinating. A urine dip was performed and Rager's vital signs were taken. His vital signs were normal and the urine dip indicated no infections. He was advised to sign up for sick line to see a physician for further examination if needed.

On March 9, 2010, Rager was seen again at sick call and stated that he had pain after urinating. A urine dip was performed and Rager's vital signs were taken. His vital signs were normal and the urine dip indicated no infections. He was advised to sign up for sick line to see a physician for further examination if needed.

On March 26, 2010, Rager was seen at sick call for continued complaints of pain with urination. Anther urine dip was done, which was normal. It was also noted

11

that Rager was in no distress and able to walk without discomfort. An order was given for Tylenol to address the stated complaints of pain.

Rager was seen in sick call again on April 2, 2010 for complaints of overactive bladder. He stated that the Ditropan was not working. The Ditropan was discontinued and other medication was prescribed.

Because Mr. Rager had no physical abnormalities in the kidneys or bladder, the consulting urologist and the physicians at this institution agreed that the best course of treatment for Mr. Rager's incontinence was treatment with medication and bladder training.

Although Mr. Rager was issued adult diapers, it was repeatedly explained to Mr. Rager that the diapers should be used only to assist in the bladder training by absorbing infrequent episodes of brief urination (or small accidents) that occurred while Mr. Rager was attempting to reach the restroom.

Adult diapers are not the medically preferred course of treatment to address urinary incontinence such as Mr. Rager's.

Furthermore, Mr. Rager's treating physicians were of the opinion that the adult diapers were not medically necessary during the stated time period.

Mr. Rager received adequate medical care to address his medical condition; however, Mr. Rager repeatedly refused to comply with the medications and treatment prescribed to address his condition.

The following treatment was also offered or provided to Rager for his epididymal cysts:

On July 24, 2006, Rager was seen in sick call for several complaints including a testicular lump, which he attributed to wearing diapers. A testicular exam was performed. No rash was seen and no masses were detected.

Rager was seen in sick call on February 22, 2007 complaining of a rash and a lump on his right testicle. No drainage, swelling or discoloration of the skin was noted; however, Rager complained of pain associated with the lump. On examination, a 0.5 cm cystic lump was noted in the right scrotum above the testicle. An ultrasound of the right testicle and scrotum was ordered and he was directed to return to sick call if the symptoms increased.

12

An ultrasound of Rager's right testicle and scrotum was performed on February 27, 2007. A moderate bilateral hydrocele with possible cystic structures was noted.

On March 11, 2008, Rager was seen in sick call complaining that the cysts in his scrotal area were more painful. The examining PA noted a small cyst above right testicle. The PA noted that Rager did not wince during the examination, indicating only mild tenderness. The PA diagnosed a stable scrotal cyst and recommended that Rager purchase Motrin through the commissary to alleviate any pain. An order was issued for Motrin once per day through April 9, 2008 was issued and P was instructed to return to sick call as needed.

Rager returned to sick call on April 8, 2008 reporting that the cyst still hurt and that the pain relievers were not working. He was noted as not being in any acute distress and no wincing was noted on examination. The PA noted a cyst of approximately 2.5 cm on the right testicle. An order was issued for Tylenol (twice a day) through April 22 and Motrin (twice a day) through April 24 and Rager was directed to return to sick call if needed.

On April 14, 2008, Rager was again seen in sick call for complaints of pain associated with the cyst. Rager stated that the pain woke him at night. He was noted as being alert, ambulatory, in no acute distress and joking and laughing. He again did not wince during the examination. The examining PA noted the possibility of epididymitis (an inflammation of the epididymis, the small tube which connects the vas deferens and to the testicle, which can be caused by an infection) and prescribed doxycycline to address any possible infection of the epididymis.

Rager returned to sick call on April 25, 2008 with continued complaints of pain associated with the cyst. He was given an order for Motrin 3 times per day through May 25, 2008 to address the pain.

Rager again returned to sick call on May 6, 2008 complaining of pain associated with the cyst. He stated that the Motrin was not helping and denied any change in pain. He again was noted as being in no acute distress, ambulating, and as demonstrating no remarkable tenderness. He was referred to a physician for further evaluation.

On May 9, 2008, Rager was seen by Dr. Diaz regarding his continued complaints of pain associated with the cyst. Upon examination, the physician determined that

there were no signs or symptoms of epididymitis or tortion. Rager's order for adult diapers was continued through November 7, 2008. He was also issued a scrotal support to address the complaints associated with the cyst and was directed to return to sick call as needed.

Rager returned to sick call on June 10, 2008 with complaints of pain associated with the cysts and requested surgical intervention. The examining PA noted that Rager was in no acute distress and was walking without compensation for pain. The PA examined the chart, including the previous ultrasound report and noted that the subjective complaints of pain were inconsistent with Rager's objective presentation. An ultrasound of the cyst was ordered.

An ultrasound of the right testicle and scrotum was performed on June 13, 2008. Two cysts were identified. There were no masses, hydroceles or varicoceles evident. The cysts were identified as most likely epididymal cysts or spermatoceles. An epididymal cyst is a benign, fluid-filled sac in the epididymis, the tube which connects the testicle and the vas deferens.

Epididymal cysts are generally painless.

On June 24, 2008, Rager returned to sick call and informed medical staff that he had returned the scrotal support on 6/10/08 because it hurt more to wear it than to go without it. The support was discontinued.

Rager returned to sick call on October 22, 2009 complaining about the cysts. He was educated about cysts and the physician noted that no medical intervention was necessary.

Other than pain medication, no medical intervention was necessary to address Mr. Rager's cysts.

(Doc. 62, ¶¶ 9 (i) - (lxx); ¶¶10-15 (i)-(xv), ¶ 16; Doc 61-1 at ¶ 6, including chronological outline; Doc. 61-2, at ¶¶ 4-15.)

Inmates with complaints relating to their confinement are permitted to file grievances through the DOC's grievance system set forth at DC-ADM 804. (Doc. 62, ¶¶ 17-18.) Under the policy that existed during the time relevant to Mr. Rager's complaints, inmates were

required to submit a grievance within fifteen working days of the event(s) on which the grievance was based and identify any individual who had information regarding the issues raised in the grievance, and to state any relief requested, including requests for monetary relief. (Id. at ¶ 18.) Inmates who were dissatisfied with the initial review decision were permitted to appeal to the Facility Manager or Superintendent within ten working days of the date of the initial review decision. (Id. at ¶ 19.) An appeal to final review could be sought by filing an appeal through the Secretary's Office of Inmate Grievances and Appeals ("SOIGA") within fifteen working days of the date of the Facility Manager's decision. (Id. at ¶ 20.) Extensions could be granted at the discretion of the agency if the inmate submitted a written explanation for a failure to timely file the grievance or an appeal. (Id.)

Rager filed two grievances relating to his health care: Grievance 164832 and 246098. (Doc. 62, at ¶ 21.) Grievance 164832, which was filed on September 26, 2006, concerned Rager's access to adult diapers. (Doc. 61-3, at 5.) He specifically complained about receiving fitted briefs as opposed to Depends protective underwear. On October 5, 2006, defendant Mataloni responded to the grievance and stated the following in denying it:

> The following is a summary of my findings regarding your grievance:
>
> In reference to this grievance we met on 10/4/06. You were told at that time, as you have been told countless number of times in the past, you will be issued what is ordered for you. You will be provided what in necessary, not what you want. During that meeting you were also warned about approaching any and all staff members and asking them for what you want, when you want. This game is over.
>
> Please allow this grievance to act as a written reinforcement of all of the verbal

orders that were given to you on 10/4/06. They are as follows:

> - Your supplies will be given to you on the AM treatment lines on Tuesday and Saturday. This is the only time they will be given to you; do not ask any other time.

> - You will be allowed 7 diapers and not more than 7 diapers only in your cell at any time. Anymore than 7 will be considered contraband, and you will be subject to disciplinary action. If you come on Tuesday or Saturday for supplies and you have some left in your cell, ask the nurse for only how many you need (i.e. if you have two left in the cell, ask her for only 5.)

I consider this grievance denied, and I consider this the last time I will ever address this issue.

(Doc. 61-3, at 6.) Rager did not appeal this decision. (Id. at ¶ 24.)

On October 8, 2008, Rager filed Grievance 246098, regarding medical treatment for two epididymal cysts. (Id. at ¶ 25.) Defendant Mataloni denied the grievance on October 10, 2008. (Id. at ¶ 26.) Rager appealed this decision to the Superintendent on or about October 22, 2008. (Id. at ¶ 27.) By decision issued October 24, 2008, the Superintendent upheld Mataloni's decision and denied the appeal. (Id. at ¶ 28.) Rager subsequently appealed the Superintendent's decision to SOIGA. (Id. at ¶ 29.) On January 14, 2009, SOIGA issued a decision denying the final grievance appeal. (Id. at ¶ 30.)

III.    **Discussion**

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials. See 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

16

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Id.; see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

## A.     Eleventh Amendment

Defendants first seek to dismiss the § 1983 claims against them in their official capacity as barred by the Eleventh Amendment. Under the Eleventh Amendment, states and state agencies are immune from suit in federal court. See Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144 (1993). "Because the Commonwealth of Pennsylvania's Department of Corrections is a part of the executive department of the Commonwealth, see PA. STAT. ANN., tit. 71, § 61, it shares in the Commonwealth's Eleventh Amendment immunity." See Lavia v. Pennsylvania Dep't of Corrections, 224 F.3d 190, 195 (3d Cir. 2000). While a state may lose its immunity by Congressional abrogation or by waiver, see id., Congress did not abrogate states' sovereign immunity when it enacted 42 U.S.C. § 1983. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 66 (1989).

Moreover, the Pennsylvania legislature has expressly declined to waive its sovereign immunity by statute. See Lavia, 224 F.3d at 195; see also 42 PA. CONS. STAT. ANN. § 8521(b). The Eleventh Amendment prohibits a lawsuit against defendants sued in their official capacities because the state is the real party in interest inasmuch as the plaintiff seeks recovery from the state treasury. Melo v. Hafer, 912 F.2d 628, 635 (3d Cir. 1990). Plaintiff's claims for damages against Mataloni, Kerker, Kasprzyk, while acting in their official capacity, are barred by the Eleventh Amendment.

## B.    Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act of 1996 (the "PLRA"), a prisoner is required to pursue all avenues of relief available within the prison's grievance system before bringing a federal civil rights action concerning prison conditions. See 42 U.S.C. § 1997e(a); Booth v. Churner, 206 F.3d 289, 291(3d Cir. 2000). It has been made clear that the exhaustion requirement is mandatory. See Williams v. Beard, 482 F.3d 637, 639 (3d Cir. 2007); see also Booth, 532 U.S. at 741 (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures"); Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir. 2000) (same). This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002).

Review of the record reveals that Rager failed to exhaust Grievance 164832 to final

18

review. Rager concedes that he failed to exhaust this grievance but seeks to be excused, arguing that in the course of the denial of his grievance Mataloni threatened him with "restrictive sanctions if he took the issue any further." (Doc. 81, at 4.)  This argument is without merit. It is clear from a reading of the grievance response that Mataloni simply reinforces, in writing, verbal orders that were given to plaintiff. There is not a single threat of restrictive sanctions contained in the response and Rager fails to come forward with any support for this assertion. The party adverse to summary judgment must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions. Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989). Plaintiff has failed to controvert defendants' position that he failed to exhaust his administrative remedies with respect to his adult diaper claim. Consequently, defendants are entitled to an entry of summary judgment on this claim.

Conversely, the court concludes that Rager appealed Grievance 246098, concerning the epididymal cysts, to final review. This issue will therefore be addressed on the merits.

### C.     Merits of Remaining Eighth Amendment Claim

To demonstrate a prima facie case of Eighth Amendment cruel and unusual punishment based on the denial of medical care, plaintiff must establish that defendants acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976); Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir. 1993). There are two components

19

to this standard: First, a plaintiff must make an "objective" showing that the deprivation was "sufficiently serious," or that the result of the defendant's denial was sufficiently serious. Additionally, the plaintiff must make a "subjective" showing that defendant acted with "a sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991); see also Montgomery v. Pinchak, 294 F.3d 492, 499 (3d Cir. 2002). The "deliberate indifference to serious medical needs" standard is obviously met when pain is intentionally inflicted on a prisoner, when the denial of reasonable requests for medical treatment exposes the inmate to undue suffering or the threat of tangible residual injury, or when, despite a clear need for medical care, there is an intentional refusal to provide that care. See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (quoting White v. Napoleon, 897 F.2d 103, 109 (1990); Monmouth County Corr. Inst. Inmates v. Lensario, 834 F.2d 326, 346 (3d Cir. 1987).

Significantly, a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference, and "mere disagreements over medical judgment do not state Eighth Amendment claims." White, 897 F.2d at 110. "Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment." Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotation and citation omitted). Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an Eighth Amendment violation. Estelle, 429 U.S. at 105-06; White, 897 F.3d at 110.

20

Based upon the evidence of record, Rager clearly suffered from a serious medical condition. However, he fails to come forward with any evidence that defendants were deliberately indifferent to his condition. Rather, the evidence demonstrates that he was simply dissatisfied with the medical care he received.

Rager was first seen in sick call on July 24, 2006, complaining of a testicular lump. An exam was performed and no mass was detected. On February 22, 2007, he complained of pain associated with the lump. On examination, a 0.5 cm cystic lump was noted in the right scrotum above the testicle. An ultrasound of the right testicle and scrotum was ordered and he was directed to return to sick call if the symptoms increased. Five days later the ultrasound was performed and a moderate bilateral hydrocele with possible cystic structures was noted.

Over the course of the next two years, every time he was seen in sick call complaining that the cyst was more painful, he was examined. At no time did he appear to be in acute distress or discomfort. His pain medication was evaluated each time and any necessary adjustments were made.

In March 2008, when he reported that the pain woke him at night, he was examined and the physician's assistant noted the possibility of epididymitis and prescribed doxycycline to address any possible infection of the epididymis. His complaints of pain continued through May 2008, at which time he was referred to a physician for further evaluation. On May 9, 2008, Rager was seen by Dr. Diaz, who determined that there were no signs or

symptoms of epididymitis or tortion. He was issued a scrotal support to address the complaints associated with the cyst and was directed to return to sick call as needed.

On June 10, 2008, he informed the medical department that he returned the scrotal support because it hurt more to wear it than to go without it. He also complained of pain and requested surgical intervention. Because his subjective complaints of pain were inconsistent with his objective presentation, a second ultrasound of the cyst was ordered. The ultrasound of the right testicle and scrotum was performed on June 13, 2008, and identified two cysts, most likely epididymal cysts or spermatoceles. Sixteen months then passed without any complaint. On October 22, 2009, he again complained of cyst pain. At that time, he was educated about cysts and the physician noted that no medical intervention, other than pain medication was necessary.

It is clear from the foregoing, that Rager was provided with more than adequate medical care relating to the testicular cysts. Every medical complaint was met by swift and steady action by medical personnel. He was consistently examined, and provided with appropriate medications. He was given a scrotal support and ultrasounds and was referred to an outside physician when the need presented itself. At no time was he deprived of medical care. Rather, Rager simply disagrees with the prescribed course of treatment. This court will not second-guess the propriety or adequacy of a particular course of treatment as it is a question of sound professional judgment. Defendants' motion for summary judgment will be granted with respect to this claim.

22

## IV.    <u>Conclusion</u>

Based on the foregoing, defendants' motion for summary judgment (Doc. 57) will be granted and judgment will be entered in favor of defendants and against plaintiff.  An appropriate order will issue.

BY THE COURT:

JUDGE JAMES M. MUNLEY
United States District Court

Dated:   March 28 , 2012

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RONALD RAY RAGER, | : | CIVIL NO. 3:10-CV-0594 |
| Plaintiff, | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | |
| PRISON HEALTH SERVICES, INC., | : | |
| et al., | : | |
| Defendants | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### ORDER

**AND NOW**, to wit, this 26 day of March 2012, upon consideration of defendants'

motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (Doc. 57), and

in accordance with the foregoing memorandum, it is hereby ORDERED that:

1. Defendants' motion for summary judgment (Doc. 57) is GRANTED.

2. The Clerk of Court is directed to ENTER judgment in favor of defendants and against plaintiff.

3. The Clerk of Court is further directed to CLOSE this case.

4. Any appeal from this order is DEEMED frivolous and not in good faith. See 28 U.S.C. § 1915(a)(3).

BY THE COURT:

JUDGE JAMES M. MUNLEY
United States District Court